UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DK LIPA LLC,

                    Plaintiff,

          -against-

SYBAC SOLAR LLC (d/b/a SB ENERGY
HOLDINGS) and MISF LLC,

                    Defendants.

No:  19-cv-1405

**COMPLAINT**

Plaintiff DK LIPA LLC ("DK LIPA"), by its attorneys Mandel Bhandari LLP, for its

complaint against Sybac Solar LLC (d/b/a SB Energy Holdings) ("Sybac") and MISF LLC

("MISF") alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for breach of contract and tortious interference with contract

related to an October 11, 2013 Right of First Offer Agreement (the "Agreement") between DK

LIPA and Sybac.

2.      The Agreement provided DK LIPA with a right of first refusal to develop a solar

energy project located in Long Island, New York, with an intended power rating of 9.9 MWp

(the "Project").

3.      The Agreement obliged Sybac to negotiate exclusively with DK LIPA and then, if

the Agreement was terminated without a deal being executed, Sybac was obligated to give DK

LIPA the right of first refusal on the Project before doing a deal with any other party.

4.      Sybac breached the Agreement by contracting with Defendant MISF to develop

the photovoltaic solar energy generating project contemplated in the Agreement without offering

a right of first refusal to DK LIPA.

5.      This is the second time Sybac has breached the Agreement and the second time DK LIPA has had to come to this Court for relief.

6.      A true and correct copy of the fully executed Agreement is attached as Exhibit A and is incorporated herein by reference.

7.      In connection with this Project, Sybac executed three Power Purchase Agreements ("PPA's") with LIPA for a total of 9.9 MWp AC of solar generated power in the town of Brookhaven, New York.

8.      The Agreement granted DK LIPA certain rights with respect to the "Project." These included the right to an exclusivity period to negotiate terms of the Project, as described in Sections 2 and 3 of the Agreement ("Exclusivity Period").  The Exclusivity Period was to be triggered by the delivery of three documents.  During this Exclusivity Period, Sybac agreed that it would not "directly or indirectly … accept any offers or proposals for the purchase, acquisition or financing" of the project.

9.      In 2015, Sybac failed to adhere to these terms of the parties' agreement.  Instead, without having provided the required documents, Sybac sent DK LIPA an offer it had received from a third party looking to buy the project, and insisted that DK LIPA had to match this $42,625,000 competing offer.  DK LIPA brought suit to prevent Sybac from breaching the Agreement and accepting a third-party bid.  This Court issued a temporary restraining order, and later a preliminary injunction, enjoining Defendant Sybac from accepting any offers for the purchase, acquisition, or financing of the Project or Site described in the Agreement.

10.      Section 8 of the Agreement provides DK LIPA with additional rights if the parties are unable to reach an agreement.  Under Section 8, DK LIPA retains a right of first refusal in the event Sybac received a written offer from a party other than DK LIPA.  The Agreement

explicitly states that the right of first refusal survives the termination of the Agreement.

11.     DK LIPA and Sybac were unable to reach an agreement during the Exclusivity Period and the Agreement terminated on January 31, 2015.

12.     In December 2015, Sybac moved for the preliminary injunction to be lifted, representing to this Court that "Should the Court decide to lift the Preliminary Injunction and declare that the parties are now operating under Section 8 of the ROFO, Sybac fully intends to deliver any third party offers that it receives." [Dkt.#55][1]

13.     On January 5, 2016 this Court lifted the preliminary injunction.  Court held that "Sybac has not threatened to breach that provision and, for the reasons explained on the record at the December 23, 2015 conference, damages for a breach of §8 are easier to calculate than damages for a breach of §2....While Sybac is no longer subject to the preliminary injunction, it of course remains subject to the requirements of §8 of the ROFO Agreement."

14.     Through public filings and news articles, DK LIPA recently learned that in November 2016, Sybac signed a letter of intent with MISF to develop a solar project in Brookhaven, New York that includes the same three PPAs, for 9.9 MWp AC, that were the subject of the Agreement.  On information and belief, Sybac and MISF have finalized their agreement and are proceeding with the development and construction of that project.

15.     Those public filings show that Sybac and MISF also agreed to an exclusivity period, during which each of the parties would "complete detailed due diligence including a review of the property, project, permits and well as a review of the existing contracts…"

16.     MISF should have learned of the Agreement during this "detailed due diligence

---

[1] All docket references are to the docket in the related case, *DK LIPA LLC v. Sybac Solar LLC*, Case No. 15-cv-6471 (JPO).

3

… of the existing contracts" because the Agreement was referenced in a publicly-filed lawsuit. MISF nonetheless entered into an agreement with Sybac to develop the Project. It did so even though DK LIPA was not informed of MISF's offer or provided an opportunity to exercise its right of first refusal under Section 8 of the Agreement.

17.     In this action, DK LIPA seeks to hold Sybac accountable for breaching the Agreement by accepting an offer from a third party in connection with the Project without providing DK LIPA an opportunity to exercise its right of first refusal. DK LIPA also seeks to hold MISF accountable for tortiously interfering with its Agreement with Sybac. DK LIPA seeks damages for losses it has suffered as a result of this breach.

## PARTIES

18.     Upon information and belief, defendant Sybac Solar LLC's members reside in either Florida or Germany.

19.     Upon information and belief, defendant MISF LLC's members reside in New York.

20.     Plaintiff DK LIPA LLC's members reside in Illinois, Connecticut, and California.

## JURISDICTION AND VENUE

21.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that (a) Plaintiff is a resident of Illinois, Connecticut, and California, and Defendants are residents of New York, Florida and Germany, and (b) the matter in controversy exceeds $75,000, exclusive of interest and costs. Although DK LIPA does not know what MISF paid for the Project, the previous third-party offer presented by Sybac was for $42,625,000.

22.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim – including the negotiation of

4

the Agreement – took place in New York, New York.

23.     Section 5 of the Agreement provides that "The laws of the State of New York shall govern the interpretation, validity, performance and enforcement of this Agreement."

## FACTUAL ALLEGATIONS

**A. The Agreement**

24.     On October 11, 2013, DK LIPA and Sybac entered into the Agreement.  As stated in the Agreement, Sybac intended to develop a solar energy project on Long Island and sell the power output to LIPA.

25.     In the Recitals of the Agreement, "Project" is defined as follows:  "Sybac is developing a photovoltaic solar energy generating project located on Long Island, New York with an intended power rating of 9.9 MWp AC (the "Project")."  The definition of "Project" does not refer to a specific site or parcel of land.

26.     "Site" is defined separately: "Sybac intends to acquire a parcel of approximately 45.0 acres in Brookhaven, Long Island, in the State of New York (the "Site")."

27.     The Recitals then explain that "Sybac desires to grant DK LIPA certain rights with respect to the Project and DK LIPA desires to accept such rights, as further described below."

28.     The definition of "Laws" includes the applicable statutes, laws, rules, ordinances and regulations of any "county, city or other political subdivision thereof on which the Site is located…"

29.     Under Section 4 of the Agreement, DK LIPA made an initial payment to Sybac upon the execution of the Agreement by depositing $25,000 into an escrow account.  Under the terms of Section 4, this payment would have been applied to the purchase price of the "Project"

had the Purchase Agreement been executed.

30.     The Agreement gave DK LIPA an Exclusivity Period in which to negotiate a

Purchase Agreement and contract for the provision of certain engineering, procurement and

construction services (an "EPC Contract") with Sybac.  Pursuant to Section 2 of the Agreement,

this Exclusivity Period would run until 30 days after the day on which Sybac delivered to DK

LIPA executed versions of (i) a project interconnection agreement, under which the power

produced by the Project could be connected to a utility grid; (ii) a project power purchase

agreement (a "PPA"), under which LIPA agreed to buy the power output from the Project; and

(iii) an option to purchase the Site from its current owner.

31.     Section 2 of the Agreement expressly states that during the Exclusivity Period,

"Sybac, its affiliates, and its respective officers, directors, employees or agents shall not directly

or indirectly shall not [sic] accept any offers or proposals for the purchase, acquisition or

financing of the Project."

32.     Until the termination of the Exclusivity Period, the parties were supposed to

negotiate and finalize a Purchase Agreement and EPC Contract.  Section 3(a) of the Agreement

expressly gives DK LIPA the right to conduct diligence during the Exclusivity Period.

33.     Section 7(a) of the Agreement provides that the Agreement is terminated if the

Exclusivity Period expires before the parties successfully come to terms on a Purchase

Agreement and EPC Contract.

34.     Section 8 of the Agreement provides an ongoing right of first refusal in the event

of termination:

        "Effect of Termination.  In the event of a termination under Paragraph 7(a) above, for 36

        months following termination of the Agreement, Sybac must notify DK LIPA within 3

business days of a written offer from a party other than DK LIPA.  Following receipt of

such notification and for 30 days thereafter, DK LIPA shall have a one-time right to enter

into and execute an EPC Contract or Purchase Agreement under terms identical in every

respect to the terms agreed upon as between Sybac and the other party, except that DK

LIPA may elect to modify the total consideration paid to Sybac under those agreements

to be the Purchase Price.  This paragraph shall survive the termination of this

Agreement."

35.     Section 5 of the Agreement provides that in the event of litigation arising out of

the Agreement, the "substantially prevailing party" is entitled to attorneys' fees.

**B.  This Court Enjoins Sybac from Shopping the Project to Third Parties without First
Complying with Section 3 of the Agreement**

36.     On June 12, 2015, Sybac sent DK LIPA a purported notice of termination, stating

that, "Pursuant to Section 7(a), DK LIPA was required to deliver an executed Purchase

Agreement and EPC Contract within the Exclusivity Period.  The Exclusivity Period has passed

and the delivery of the documents never occurred."

37.     The same day, Sybac simultaneously sent DK LIPA a letter giving notice that it

had received a competing offer to purchase the Project from a third party.  The letter stated,

"Pursuant to Section 8 of the Agreement, you have thirty (30) days from the date of this letter to

match the offer on terms identical in every respect to the terms agreed to by Sybac and the third

party.  A copy of the offer is attached to this letter."

38.     Sybac sent this letter even though it had failed to provide the documents it was

required to send to DK LIPA before the clock on the expiration of the Exclusivity Period even

began to run.

39.     DK LIPA corresponded with Sybac in an effort to obtain the necessary

documents, but Sybac refused to provide them.  Nonetheless, on July 22, 2015, Sybac sent DK

LIPA a letter stating that because DK LIPA had not matched the offer in the Letter of Intent, "be

advised that DK LIPA's one-time right to present a matching offer has expired as of the date of

this notice." On July 31, 2015, Sybac told DK LIPA that it would have no further

communication with DK LIPA concerning the Project.

      40.     On August 17, 2015, DK LIPA filed a Complaint in this Court seeking to stop

Sybac from encumbering or selling the project while the Exclusivity Period was still in effect.

[Dkt.#1]

      41.     On August 18, 2015, this Court granted a Temporary Restraining Order ("TRO")

restraining and enjoining Sybac from "(i) accepting any offers or proposals for the purchase,

acquisition or financing of the Project or Site, and (ii) taking any steps to encumber or sell the

Project or Site, at least until the hearing set forth above, at which time plaintiff's request that

defendant be preliminarily enjoined from accepting any offers or proposals for the purchase,

acquisition or financing of the Project or Site during the pendency of this case is addressed."

[Dkt.#6]

      42.     On October 10, 2015, this Court granted a Preliminary Injunction against Sybac.

Finding Sybac's arguments "unpersuasive," the Court held that by "taking the positions it took,

Sybac denied DK LIPA the benefit of the final 30 days of the Exclusivity Period."  [Dkt.#36 at

3-5].  This Court further held that "there is a risk Sybac will either (1) accept a third party's offer

for the Project or (2) insist that DK LIPA match a third party offer pursuant to § 8 of the ROFO

Agreement." [Dkt.#36 at 5] The Court therefore enjoined Defendant Sybac from "accepting any

offers for the purchase, acquisition, or financing of the Project or Site described in the October

11, 2013 Right of First Offer Agreement between DK LIPA and Sybac." [Dkt.#36 at 6]

**C. Sybac Repeatedly Represents to this Court That it Will Abide by Section 8 of the Agreement**

43.     In December 2015, Sybac moved to have the preliminary injunction lifted, arguing that an injunction was no longer necessary because it had complied with Sections 2 and 3 of the Agreement, the Exclusivity Period had expired, and DK LIPA continued to retain its rights under Section 8.

44.     Notably, among the documents Sybac was required to provide under the Agreement were the PPAs.  Sybac did provide three PPAs: 2013-2176 (.5 MW) 2013-2177 (.5MW), and 2013-197 (8.95 MW).  These three PPA's totaled the 9.9 MWp AC discussed in the Agreement.  The PPA's state that they are for Projects 1, 2, and 3.

45.     In opposing Sybac's motion, DK LIPA expressed its fear that "Without a preliminary injunction, Sybac might choose to sell the project to a third party without giving DK LIPA an opportunity to match." [Dkt.#55]  DK LIPA was "willing to terminate the Exclusivity Period as long as long as it gets a chance to match a good faith offer for the project pursuant to Section 8 of the ROFO.  Until then, DK LIPA respectfully requests that the preliminary injunction remain in place." [Id]

46.     In response, Sybac repeatedly assured this Court that it understood and would abide by its obligations under Section 8 of the Agreement.  Sybac wrote to the Court: "Should the Court decide to lift the Preliminary Injunction and declare that the parties are now operating under Section 8 of the ROFO, Sybac fully intends to deliver any third party offers that it receives."  [Dkt.#56]

47.     During a hearing before this Court on December 23, 2015, Sybac's counsel reiterated Sybac's purported commitment to abiding by Section 8 of the Agreement:

- "And we are clearly understanding of the fact that if we do get a third-party offer

that we have to present it to them within three days and they have to – they have

30 days in order to match that."  [Dkt.#65: transcript Dec. 23, 2015 8:23-9:2]

- "...and they are protected under paragraph eight, then we can't just sell it to any

   third party. We have to give them an opportunity to match it.  There is simply no

   fear and no basis whatsoever that we're going to run out and sell it to a third party

   and try to undermine them." [*Id*. 23:5-10.]

48.     This Court credited Sybac's representation at the hearing, observing that "They're

not going to.  They're not going to sell it to a third party.  There is no threat of that." [*Id*.]

49.     On January 5, 2016, this Court lifted the preliminary injunction, finding that

"Sybac has not threatened to breach that provision [Section 8] and, for the reasons explained on

the record at the December 23, 2015 conference, damages for a breach of §8 are easier to

calculate than damages for a breach of §2....While Sybac is no longer subject to the preliminary

injunction, it of course remains subject to the requirements of §8 of the ROFO Agreement."

[Dkt.#61]

**D.  In 2016, Sybac and MISF Agree to Develop the Project**

50.     Public filings show that Sybac and MISF executed a Letter of Intent on November

14, 2016 to co-develop a solar project in Brookhaven.

51.     The Letter of Intent identifies three PPAs by number. These are the exact same

PPA's – 2013-2176 (.5 MW) 2013-2177 (.5MW), and 2013-197 (8.95 MW), for a total of 9.9

MWp AC – that Sybac presented to DK LIPA.

52.     The Site Sybac originally proposed to DK LIPA and that is identified in the PPAs

is Northwood Property, Moriches Middle Island Road.

53.     The Site described in the Letter of Intent between Sybac and MISF is the south

side of Moriches-Middle Island Road to the east of Cranford Boulevard.

54.     On information and belief, the two properties are across the street from one another.

55.     Also included in the public filings is a letter from PSEG Long Island (LIPA's successor) stating that Sybac is "authorized to relocate the **_Projects_** to another location [sic] Moriches Middle Island Road." (emphasis added)

**E.  Sybac Fails to Offer DK LIPA the Right Of First Refusal as Required by Section 8**

56.     Section 8 of the Agreement provides that for 3 years following termination of the Agreement Sybac must notify DK LIPA within 3 business days of a written offer from a party other than DK LIPA.  DK LIPA would then have a 30-day window to exercise its right of first refusal.

57.     The Agreement terminated no earlier than December 31, 2015.

58.     Sybac entered into the Letter of Intent with MISF on November 14, 2016, less than three years after the Agreement terminated.

59.     The project addressed in the Letter of Intent is the same "Project" covered by the Agreement, specifically a photovoltaic solar energy generating project located in Long Island, New York with an intended power rating of 9.9 MWp AC.

60.     In breach of Section 8 of the Agreement, Sybac did not provide DK LIPA with the written offer, nor did Sybac provide DK LIPA with an opportunity to exercise its right of first refusal.

**F.  Sybac Resists Discovery on the Names of Potential Deal Parties**

61.     In the prior litigation, Sybac repeatedly resisted discovery concerning offers it had received from third parties, communications with those parties, and the names of those parties.

In June of 2016, Sybac moved in this Court for a Protective Order preventing discovery of these documents.

62.     This Court granted that motion in part, requiring Sybac to produce documents concerning offers or proposals from other entities for the Project but only to the extent that such documents were dated on or before December 31, 2015.  This Court also granted Sybac's request to redact the names of those entities.

63.     Given that the Letter of Intent was signed in November 2016, it appears that Sybac was already in discussions with MISF when they moved for the protective order.

64.     Indeed, according to a March 31, 2016 letter from Kevin Kispert, an analyst with the New York State Department of Environmental Conservation, the Draft Environmental Impact Statement of the Project was dated January 2016 and the Project was presented to the Brookhaven Town Planning Board on March 21, 2016.

65.     These facts strongly suggest that Sybac sought the protective order in order to conceal the deal it was planning to make with MISF.

### G.  At the February 1, 2017 Hearing, Sybac Represents to This Court That No Other Projects Covered by the Agreement were Pending

66.     On February 1, 2017, this Court asked Sybac's counsel point blank whether there were other ongoing projects that would be covered by the Agreement.  Sybac's counsel answered as follows:

"THE COURT: Is the project dead, as far as you know?

MR. BROWN: For all intents and purposes on that piece of property, yes, it is.

THE COURT: Is there any other possible project going on that would be within the ambit of the agreements at issue in this case?

MR. BROWN: I'm not sure of that. I can't really answer to that. In terms of -- as far as

the Right of First Offer agreement that was dated back in October of 2013, it referenced a

particular piece of property, 45 acres in the Township of Brookhaven, that property

located in the Manorville area. So as far as my office is aware, no. [*Id*. 3:22-4:2]

67.     This answer appears parsed to avoid disclosing that months earlier Sybac had

signed the letter of intent with MISF to develop the Project in an adjacent property.

68.     This Court dismissed the litigation as moot immediately following the February 1,

2017 hearing.

**H. MISF Was Aware of the Agreement and Intentionally Induced Sybac to Breach It**

69.     The prior litigation between the parties and the terms of the Agreement were

publicly available.  Minimal diligence on Sybac would have turned up the existence of the

Agreement and specifically Section 8 of that Agreement, which is discussed in this Court's prior

orders.

70.     Furthermore, the Letter of Intent between Sybac and MISF included an

exclusivity period, during which each of the parties would "complete detailed due diligence

including a review of the property, project, ***permits as well as a review of the existing

contracts…***" (emphasis added).

71.     Under these facts, MISF knew or should have known of the existence of a valid

contract between Sybac and DK LIPA covering the Project, including the three PPAs.

72.     MISF nonetheless offered and agreed to develop the Project using the existing

PPAs, even though DK LIPA never received notice or opportunity to exercise its right of first

refusal.  Had Sybac actually abided by Section 8 of the Agreement, DK LIPA could have

obtained the benefit of MISF's negotiations with Sybac through its right of first refusal.

Although the negotiations between MISF and Sybac are not public, it is reasonable to infer that

MISF intended to procure Defendants' breach of the Agreement and did so without justification.

13

73.     As a result of this breach, DK LIPA has been unable to exercise its right of first refusal, and effectively denied the opportunity to develop the Project, causing significant damages.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT
### (As to Defendant Sybac LLC)

74.      Plaintiff repeats and re-alleges paragraphs above as if fully set forth herein.

75.     Sybac and DK LIPA are parties to the Agreement.

76.     The Agreement is a valid contract.

77.     DK LIPA has fulfilled its obligations and duties owing to Sybac under the Agreement.

78.     Section 8 of the Agreement requires that Sybac must notify DK LIPA within 3 business days of a written offer from a party other than DK LIPA.  Following receipt of such notification and for 30 days thereafter, DK LIPA shall have a one-time right to enter into and execute an EPC Contract or Purchase Agreement under terms identical in every respect to the terms agreed upon as between Sybac and the other party, except that DK LIPA may elect to modify the total consideration paid to Sybac under those agreements to be the Purchase Price.

79.     Section 8 survives the termination of this Agreement.

80.     DK LIPA's right of first refusal is valid and valuable.

81.     Sybac breached the Agreement by failing to give DK LIPA notice of the offer from MISF and thereby denying DK LIPA the opportunity to exercise its right of first refusal.

82.     As a direct and proximate result of Sybac's breach of the Agreement and DK LIPA's right to the right of first refusal, DK LIPA has suffered damages in the amount of the benefit DK LIPA would have received by executing the right of first refusal.  DK LIPA

anticipates that this is no less than $4 million.

83.     DK LIPA therefore requests an award of damages in an amount to be calculated at trial.

## SECOND CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH CONTRACT
### (As to Defendant MISF LLC)

84.     Plaintiff repeats and re-alleges paragraphs above as if fully set forth herein.

85.     Sybac and DK LIPA are parties to the Agreement.

86.     The Agreement is a valid contract.

87.     On information and belief, Defendant MISF had knowledge of the Agreement.

88.     Defendant MISF nonetheless procured Sybac's breach of the contract without justification.

89.     DK LIPA has suffered damages a direct result of MISF's actions.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff DK LIPA prays that judgment be entered against Defendant Sybac as follows:

A.     On all claims, for recovery of DK LIPA's actual damages in an amount to be determined at the time of trial;

B.     On all claims, for attorneys' fees, expenses and costs as provided for by law or contract; and

C.     For such other and further relief as the Court seems just and proper.

**DATED:**     New York, New York
              February 13, 2019


By: _____
    Rishi Bhandari

    MANDEL BHANDARI LLP
    Rishi Bhandari
    A.  Leah Vickers
    Donald Conklin
    80 Pine Street, 33rd Floor
    New York, NY 10005
    T:  (212) 269-5600
    F:  (646) 964-6667
    rb@mandelbhandari.com

    *Attorneys for Plaintiff DK LIPA LLC*

# Exhibit A

RIGHT OF FIRST OFFER AGREEMENT

This RIGHT OF FIRST OFFER AGREEMENT ("Agreement") is made as of October 11, 2013 (the "Effective Date"), by and between DK LIPA LLC, a Delaware limited liability company, with its principal place of business at 401 Greenwich Street, Suite 300, New York, NY 10013 ("DK LIPA"), and SYBAC SOLAR LLC, a Florida limited liability company, with its principal place of business at 6735 Conroy Windermere Rd., Suite 401, Orlando, FL 32835 (the "Sybac").

RECITALS:

A. Sybac is developing a photovoltaic solar energy generating project located in Long Island, New York with an intended power rating of 9.9 MWp AC (the "Project");

B. Sybac intends to sell the electric power output of the Project to Long Island Power Authority ("LIPA") under a power purchase agreement (the "PPA") to be negotiated with LIPA;

C. Sybac intends to acquire a parcel of approximately 45.0 acres in Brookhaven, Long Island, in the State of New York (the "Site") from a third party (the "Site Owner") as part of a land purchase agreement (the "Land Purchase Agreement") for the purpose of locating the Project;

D. Sybac desires to grant DK LIPA certain rights with respect to the Project and DK LIPA desires to accept such rights, as further described below.

NOW, THEREFORE, it is agreed as follows:

1. Definitions:

   a. "Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified.

   b. "EPC Contract" means an agreement for the provision of certain engineering, procurement and construction services entered into between the Purchaser (or an Affiliate of the Purchaser) and the Seller.

   c. "Force Majeure" means, any act or event that delays or prevents a party from performing all or a portion of its obligations under this Agreement or from complying with all or a portion of the conditions under this Agreement if such act or event, despite the exercise of reasonable efforts by such party, cannot be avoided by, and is beyond the reasonable control of, the party relying thereon as justification for such delay, nonperformance, or noncompliance. Without limiting the generality of the foregoing, so long as the following events satisfy the requirements set forth herein, a Force Majeure may include: (i) natural

phenomena, such as storms, hurricanes, floods, lightning and seismic activity, including earthquakes and volcanic eruptions; (ii) explosions or fires arising from lightning or other causes unrelated to the acts or omissions of the party seeking to be excused from performance; (iii) acts of war or public disorders, civil disturbances, riots, insurrection, sabotage, epidemic, terrorist acts or rebellion; (iv) national strikes or national labor disputes; and (v) action by a Governmental or Regulatory Authority, including a moratorium on any activities related to this Agreement (except with respect to Seller's failure to obtain any Permit or comply with Laws), or failure of a Governmental Authority to issue permits in a timely manner despite the diligence of Seller. Notwithstanding anything to the contrary, a Force Majeure shall not be deemed to include: (a) Site Conditions; (b) any labor disturbance affecting either a contractor or subcontractors, to the extent that such labor disturbance involves direct employees of the contractor or subcontractors who are performing Work on the Project, except for strikes or lockouts national or regional in scope; (c) inability of a contractor to obtain equipment to construct the Project, equipment failures or acts or omissions of agents or subcontractors of a contractor, except to the extent such acts or omissions arise from a Force Majeure; or (d) any other delay, default or failure (financial or otherwise) of a subcontractor, vendor or contractor performing work on the Project, unless it would otherwise qualify as a Force Majeure hereunder.

d. "Governmental or Regulatory Authority" means any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any authority, agency, department, board, commission or instrumentality of the United States, including the Internal Revenue Service, the Federal Energy Regulatory Commission and any of its regional entities, the North American Electric Reliability Corporation, LIPA, any state of the United States or any political subdivision thereof, any international or multinational agency, authority or commission, and any tribunal, court or arbitrator(s) of competent jurisdiction.

e. "Interconnection Cost" means the cost to interconnect the Project to the LIPA grid and to any upgrades to the LIPA interconnection as specified in the PPA or an Interconnection Agreement with LIPA.

f. "Land Reimbursement Amount" means the amount paid to Site Owner under the Land Purchase Agreement, including, but not limited to, any option payments, real property transfer, recording, gains, documentary, fees, taxes, assessments or other closing costs associated with such acquisition.

g. "Laws" means any applicable statute (including the Code), law (including any law relating to cultural or historic resources), rule, treaty, ordinance, code, guidance

HAP

AM

document, regulation, rate, ruling, order, restriction, requirement, writ, injunction, decree and other pronouncements having the effect of law in the United States, the State of Florida, or any county, city or other political subdivision thereof on which the Site is located, which has been enacted, issued or promulgated by any Governmental or Regulatory Authority.

h. "Permits" means any license, consent, permit, authorization, requirement, environmental plan, filing, certification, exemption, waiver, tariff, franchise, variance, order, decision, registration, ruling and other approval or permission required under any Law for the Project, including as to zoning, road crossing, environmental protection, pollution, sanitation, energy regulation, safety, siting or building, obtained or required to be obtained by or on behalf of the Seller or the Project from any Governmental or Regulatory Authority.

i. "Person" means any individual, corporation, company, voluntary association, partnership, joint venture, labor union, trust, limited liability company, other business or similar entity or Governmental or Regulatory Authority.

2. Exclusivity Period. The "Exclusivity Period" shall comprise the period from the Effective Date hereof until the earlier of (i) 5:00 P.M. New York time on the date that falls thirty (30) days after the day on which Sybac delivers an executed PPA and Interconnection Agreement between Sybac (or an Affiliate thereof) and LIPA, and Option to Purchase the Site with Site Owner; or (ii) the execution between DK LIPA and Sybac (or an Affiliate thereof) of a binding Purchase Agreement and EPC Contract. The parties agree that during the Exclusivity Period, Sybac, its affiliates, and its respective officers, directors, employees, or agents shall not directly or indirectly shall not accept any offers or proposals for the purchase, acquisition, or financing of the Project.

3. During the Exclusivity Period:

a. DK LIPA shall have the right to conduct due diligence activities to support the acquisition of Sybac's assets.

b. The parties agree to conduct negotiations in good faith and to use commercially reasonable efforts to reach agreement on the Purchase Agreement as soon as reasonably practical, but no later than the expiration of the Exclusivity Period, as may be extended by the mutual agreement of the Parties in their sole discretion; provided that the purchase price shall be $2.80 per watt, payable in accordance with the Milestone Payment Schedule attached to the EPC Contract, subject to adjustment for unanticipated costs due to Force Majeure or unanticipated Site conditions (the "Purchase Price").

c. The Purchase Price shall be exclusive of the following items:

    i. Land Reimbursement Amount: The Land Reimbursement Amount shall be excluded from the Purchase Price and paid directly by Purchaser to Site Host in accordance with the terms of the Land Purchase Agreement or, if paid by Seller, reimbursed to Seller. If the actual Land Reimbursement Amount is less than $5,400,000.00, Purchaser shall pay to Seller, within 10 Business Days of the payment of the Land Reimbursement Amount by Purchaser, 50% of the difference between the actual Land Reimbursement Amount and $5,400,000.00.

    ii. Interconnection Cost: The Interconnection Cost shall be excluded from the Purchase Price and paid by Purchaser to Seller in accordance with the Milestone Payment Schedule attached to the EPC Contract. If the actual Interconnection Cost is less than the amount specified in Attachment A, Purchaser shall pay to Seller, within 10 Business Days of the payment of the Interconnection Cost by Seller, 50% of the difference between the actual Interconnection Cost and the amount specified in Attachment A.

4. <u>Initial Payment</u>. Upon execution of this Agreement, DK LIPA shall pay $25,000 into an escrow account which shall be released to DK LIPA if the parties fail to execute a Purchase Agreement for the subject transaction and DK LIPA's affiliate is not in default under Prior Purchase Agreement. Otherwise, the Initial Payment shall be released to Sybac upon expiration of the Exclusivity Period and, if the Purchase Agreement has been executed, applied to the purchase price of the Project.

5. <u>Attorneys' Fees; Jurisdiction</u>. In the event of any litigation arising out of this Agreement, the court shall award the substantially prevailing party all reasonable costs and expenses including attorneys' fees. The laws of the State of New York shall govern the interpretation, validity, performance and enforcement of this Agreement.

6. <u>Assignment</u>. Neither party may assign this Agreement without the prior written consent of the other party.

7. <u>Termination of Agreement</u>. This Agreement shall terminate upon any of the following:

    a. In the event that the Purchase Agreement and EPC Contract are not executed within the Exclusivity Period;

    b. Under that certain Purchase Agreement For Prairie View Solar Array, by and between Sybac and DK Prairie View, LLC, a Delaware limited liability company, attached hereto as Attachment B (the "<u>Prior Purchase Agreement</u>"), Sybac and DK Prairie View, LLC shall have failed to achieve a Closing (as defined therein), or DK Prairie View, LLC is in default under the Prior Purchase Agreement; or

    c. By mutual agreement of the parties.

8. **Effect of Termination.** In the event of a termination under Paragraph 7(a) above, for 36 months following termination of the Agreement, Sybac must notify DK LIPA within 3 business days of a written offer from a party other than DK LIPA. Following receipt of such notification and for 30 days thereafter, DK LIPA shall have the one-time right to enter into and execute an EPC Contract or Purchase Agreement under terms identical in every respect to the terms agreed upon as between Sybac and the other party, except that DK LIPA may elect to modify the total consideration paid to Sybac under those agreements to be the Purchase Price. This paragraph shall survive the termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

DK LIPA, LLC

By:      WestJIC LLC, its Managing Member

By:      _____

Name: Halton A. Peters

Title: Managing Member of WestJIC LLC


SYBAC SOLAR LLC

By:      _____

Name: Artur Madej

Title: President